# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| LISA AXELROD, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | CLASS ACTION |
| v. | |
| MARRIOTT INTERNATIONAL, INC. | |
| And | **JURY TRIAL DEMANDED** |
| STARWOOD HOTELS AND RESORTS WORLDWIDE, LLC, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.    FACTS ................................................................................................................ 1

    A.    On November 30, 2018, Marriott admitted that the Starwood
        computer systems had been breached and data exfiltration had
        been ongoing for at least four years. ....................................................... 2

    B.    Marriott negligently left its Starwood computer systems vulnerable
        to the breach. ........................................................................................... 3

        1.    Marriott unreasonably delayed notifying affected persons
            whose data had been stolen. ....................................................... 6

        2.    Marriott collects consumers' personal information. ................................. 8

        3.    Plaintiff and other Nationwide Class members have
            suffered harm as a result of the data breach. ........................... 10

II.   JURISDICTION AND VENUE ......................................................................... 13

III.  PARTIES ........................................................................................................ 14

    A.    Plaintiff ................................................................................................. 14

        1.    Lisa Axelrod ............................................................................ 14

    B.    The Defendants ..................................................................................... 14

IV.   CLASS ALLEGATIONS ................................................................................. 15

V.    COUNTS ........................................................................................................ 18

COUNT I NEGLIGENCE (BROUGHT BY PLAINTIFF ON HER OWN
        BEHALF AND  ON BEHALF OF THE NATIONWIDE CLASS, OR,
        ALTERNATIVELY,  PLAINTIFF ON HER OWN BEHALF AND ON
        BEHALF OF  THE FLORIDA SUBCLASS) ................................................. 18

COUNT II NEGLIGENCE *PER SE* (BROUGHT BY PLAINTIFF ON HER
        OWN BEHALF AND ON BEHALF OF THE NATIONWIDE CLASS,
        OR, ALTERNATIVELY, PLAINTIFF ON HER OWN BEHALF AND
        ON BEHALF OF THE FLORIDA SUBCLASS) ......................................... 20

COUNT III MARYLAND CONSUMER PROTECTION ACT MD CODE
        COMMERCIAL LAW, § 13-301, *ET. SEQ.* (BROUGHT BY PLAINTIFF
        ON HER OWN BEHALF AND ON BEHALF OF THE NATIONWIDE

CLASS, OR, ALTERNATIVELY, PLAINTIFF ON HER OWN BEHALF
AND ON BEHALF OF THE FLORIDA SUBCLASS)...................................................22

COUNT IV UNJUST ENRICHMENT (BROUGHT BY PLAINTIFF ON HER
OWN BEHALF AND ON BEHALF OF THE NATIONWIDE CLASS,
OR, ALTERNATIVELY, PLAINTIFF ON HER OWN BEHALF AND
ON BEHALF OF THE FLORIDA SUBCLASS) ...........................................................24

COUNT V VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE
PRACTICES ACT, FLA. STAT. § 501.201, ET SEQ., AND THE
UNFAIR TRADE PRACTICES STATUTES (BROUGHT BY
PLAINTIFF AND THE FLORIDA SUBCLASS) ...........................................................26

PRAYER FOR RELIEF ..............................................................................................................29

JURY TRIAL DEMANDED .......................................................................................................30

010791-11  1090410 V1

For her complaint against Defendants Marriott International, Inc. ("Marriott") and Starwood Hotels and Resorts Worldwide, LLC ("Starwood"), Plaintiff Lisa Axelrod alleges on her own behalf and on behalf of all others similarly situated, including the Class and Florida Subclass described herein, as follows:

1.    A hospitality organization that purposefully collects and retains highly sensitive personal information must protect the highly sensitive personal and financial information that it collects from customers.  When personal information is collected by a hospitality company as a requirement to providing its services, the company must be at the forefront of data security to ensure that thieves and hackers could *never* get access to the data the company has collected.  It cannot let its security lie fallow for years, failing to update to the latest security, failing to patch critical software effectively and promptly, failing to invest in data security at sufficient levels, and especially failing to detect gaping holes in security that have been present and hemorrhaging data for years on end.  And when a data breach involving up to 500 million records of innocent customers occurs, a hospitality company must *immediately and accurately* notify all those affected to prevent consumers from becoming victims of identity theft. And it must take immediate steps to mitigate the damages it has caused.  This lawsuit stems from Defendants' abject failure to follow these simple rules.

## I.    FACTS

2.    Marriott International, Inc. is a global hospitality company with over 6,700 properties located throughout the world.  In 2017, Marriott reported $22 billion in revenue. Marriott is headquartered just outside of Washington, DC in Bethesda, Maryland.

3.    Starwood Hotels and Resorts Worldwide was an entity independent from Marriott until September 2016 when Marriott completed a $13 billion acquisition of Starwood.  The combined entity created the world's largest hotel chain and includes, among others, the

following major hotel brands:  Marriott, JW Marriott, Courtyard, Ritz-Carleton, Element Hotels,

Aloft Hotels, The Luxury Collection, Tribute Portfolio, Le Méridien Hotels & Resorts, Four

Points by Sheraton and Design Hotels.

4.      According to Marriott's own press releases, the crown jewel in the Starwood

transaction was Starwood's reservation and loyalty system, called Starwood Preferred Guest.

Marriott touted the reservation and loyalty program as having high-value members who loyally

book many extended stays at Starwood properties.

**A.      On November 30, 2018, Marriott admitted that the Starwood computer systems had been breached and data exfiltration had been ongoing for at least four years.**

5.      On November 30, 2018, Marriott first disclosed that its computer systems had

been hacked.  On its website and in press releases, the company stated:

> On September 8, 2018, Marriott received an alert from an internal
> security tool regarding an attempt to access the Starwood guest
> reservation database. Marriott quickly engaged leading security
> experts to help determine what occurred. Marriott learned during
> the investigation that there had been unauthorized access to the
> Starwood network since 2014. Marriott recently discovered that an
> unauthorized party had copied and encrypted information, and took
> steps towards removing it. On November 19, 2018, Marriott was
> able to decrypt the information and determined that the contents
> were from the Starwood guest reservation database.
>
> Marriott has not finished identifying duplicate information in the
> database, but believes it contains information on up to
> approximately 500 million guests who made a reservation at a
> Starwood property. For approximately 327 million of these guests,
> the information includes some combination of name, mailing
> address, phone number, email address, passport number, Starwood
> Preferred Guest ("SPG") account information, date of birth,
> gender, arrival and departure information, reservation date, and
> communication preferences. For some, the information also
> includes payment card numbers and payment card expiration dates,
> but the payment card numbers were encrypted using Advanced
> Encryption Standard encryption (AES-128). There are two
> components needed to decrypt the payment card numbers, and at
> this point, Marriott has not been able to rule out the possibility that
> both were taken. For the remaining guests, the information was
> limited to name and sometimes other data such as mailing address,
> email address, or other information. Marriott reported this incident

to law enforcement and continues to support their investigation.
We have already begun notifying regulatory authorities.[1]

6.      Marriott's Press Release, though measured in its tone, reveals several shocking facts about the company's abject failure to adequately protect customer information:

      a.  As many as ***500 million Marriott/Starwood customers are victims*** of this data breach, making it second only to the massive Yahoo account data breach in terms of the number of affected consumers;

      b.  The data stolen is ***extremely valuable to identity thieves*** because it contains elements that can be used to falsely verify fraudulent accounts, like passport numbers, specific travel dates, gender, dates of birth, email addresses, phone numbers, and for millions of victims, payment card information;

      c.  While Defendants claim to have encrypted payment card information, they took no similar steps to protect the even more valuable personal information like passport numbers and travel details that they collected; and

      d.  Defendants plainly were asleep at the wheel as this data was being exfiltrated from their systems ***for at least four years while they had no idea the breach was ongoing***.

**B.      Marriott negligently left its Starwood computer systems vulnerable to the breach.**

7.      The massive data breach could have been prevented and should have been detected and disclosed earlier. While Marriott admits the intrusion occurred at least as early as 2014, Marriott claims it was first detected on September 8, 2018.  Marriott—a company with revenues of $22 billion and resources enough to buy Starwood for $13 billion in 2016—thus admits its systems were compromised for at least four years before it had any idea it had been hacked.

---

[1] *See* Kroll, *Starwood Guest Reservation Database Security Incident*, https://answers.kroll.com/ (last accessed Dec. 6, 2018) ("Marriott Press Release").

8.      But what makes this breach even worse is that Marriott knew that hackers valued the data it and Starwood stored as it was often targeted, *and often its systems were compromised*—yet data security was still neglected and under-supported by Defendants.

9.      As recently as November 2015, when Marriott clearly would have been doing a due diligence investigation prior to acquisition, Starwood revealed that the Point of Sale ("PoS") systems at 54 of its hotels in North America had been attacked, were infected with malware, and customer payment data was being stolen by hackers.

10.      Shockingly, while Starwood admitted that "malware affected certain restaurants, gift shops and other point of sale systems at the relevant Starwood properties", it affirmatively stated there was "no indication that our guest reservation or Starwood Preferred Guest membership systems were impacted."  But Starwood was flat wrong about that, as it now admits that during the time of this PoS attack it *was actively hemorrhaging data from its guest reservation and Starwood Preferred Guest membership system while simultaneously claiming that it was not.*

11.      Marriott's track record is equally poor.  In February 2015, Marriott admitted that one of its franchisees had similarly allowed its PoS systems to be hacked and that sensitive customer information from at least 10 Marriott locations had been compromised.  Instead of taking steps to prevent such hacks (or even detect the then ongoing hack), Marriott stated: "As this impacts customers of Marriott hotels we want to provide assurance that Marriott has a long-standing commitment to protect the privacy of the personal information that our guests entrust to us, and we will continue to monitor the situation closely."[2]

12.      Marriott's November 30, 2018 press release stated: "Marriott values our guests and understands the importance of protecting personal information."[3]  Ironically, the 2015 PoS

---

[2] Hotel Franchise Firm White Lodging Investigates Breach, KERBS ON SECURITY (Jan 31, 2014) https://krebsonsecurity.com/tag/marriott/ (last accessed Jan. 14, 2019).

[3] Kroll, *Starwood Guest Reservation Database Security Incident*, https://answers.kroll.com/ (last accessed Dec. 6, 2018) ("Marriott Press Release").

press release claimed: "We take our obligation to safeguard personal information very seriously and are alerting affected customers about this incident so they can take steps to help protect their information."[4]  But the facts are the facts, clearly Marriott and Starwood did not and do not take data protection seriously enough to protect their customers information from hackers, or to even know that for four long years, hackers have been stealing their customers sensitive data at will and without detection.

13.     And it is not just its own past data breaches that should have prompted Marriott to take data security more seriously, there have been scores of recent public data breach events in the hospitality industry, including at Marriott's major competitors:

- Hilton in 2015, affecting 360,000 guests

- Huazhu Hotels Group (China) in 2018, affected hundreds of millions of guests

- Sabre Hospitality (which handles reservations for scores of hotels) in 2016 and 2017

- Hyatt in 2015 and again in 2017, affecting 291 of its properties

- InterContinental Hotels in 2016, affecting over 1,000 of its properties

- Kimpton in 2016, affecting more than 60 of its properties

- Omni Hotels in 2016, affecting more than 50,000 guests at 49 properties

14.     And all of this is set on the backdrop of massive data breaches over the last 10 years including:

- Equifax in 2017, resulting it the theft of credit information for 150 million consumers

- Anthem in 2015, resulting in the theft of personal and health insurance information for 80 million consumers

- Yahoo! Over the prior four years, exposing the account information of billions of users

- Home Depot in 2014 and Target in 2013, resulting in the theft of data concerning hundreds of millions of credit and debit accounts

---

[4] The Gate with Brian Cohen, *More Data Breaches With Starwood and Hilton: What You Can Do*, https://thegate.boardingarea.com/data-breaches-starwood-hilton-can/ (last accessed Jan. 14, 2019).

15.     Yet neither its own data breaches, those of its competitors, nor those of the country's leading consumer-facing companies, caused Marriott to direct sufficient resources to protect its own warehousing of the highly personal information of hundreds of millions of customers.  As reported in Forbes: "'With all the resources they have,' says Andrei Barysevich, a researcher with the threat intelligence company Recorded Future, 'they should have been able to isolate hackers back in 2015.'"[5]

16.      As Marriott CEO Arne Sorenson now admits: "We fell short of what our guests deserve and what we expect of ourselves."[6]

1.      **Marriott unreasonably delayed notifying affected persons whose data had been stolen.**

17.     Despite numerous lessons of past corporate titan's failures to promptly notify consumers, the Marriott breach was not disclosed for *nearly 12 weeks* after Marriott's self-delayed discovery.  Instead of promptly detecting and promptly notifying the hundreds of millions of consumers whose personal information was stolen, Marriott said nothing, leaving consumers' data in the hands of hackers unfettered for at least three months between the time the breach was first detected and the time Marriott publically announced it.

18.     Back when Equifax was one of the largest data breaches in history, The Wall Street Journal made the scope of that breach graphically clear:[7]

---

[5] *See* Volodzko, David, *Marriott Breach Exposes Far More Than Just Data*, FORBES (Dec. 4, 2018), https://www.forbes.com/sites/davidvolodzko/2018/12/04/marriott-breach-exposes-far-more-than-just-data/#387b1a0f6297 (last accessed Dec. 4, 2018).

[6] Mariott International, Inc., *Marriott Announces Starwood Guest Reservation Database Security Incident*, (Nov. 30, 2018), http://news.marriott.com/2018/11/marriott-announces-starwood-guest-reservation-database-security-incident/ (last accessed Jan. 14, 2019).

[7] Anna Maria Andriotis and Ezequiel Minaya, *Equifax Reports Data Breach Possibly Affecting 143 Million U.S. Consumers*, WALL STREET JOURNAL (Sept. 8, 2017).  *Available at*: https://www.wsj.com/articles/equifax-reports-data-breach-possibly-impacting-143-million-u-s-consumers-1504819765?mod=pls_whats_news_us_business_f (last accessed Dec. 20, 2018).



19.    If that graph was amended to include the instant Marriott breach, it would tie for the silver medal with Yahoo!, yet this breach is far more devastating to customers because of the depth of the information at risk.  Marriott did not just lose people's names, addresses, account information and payment card information, it also lost highly secure information such as passport numbers, trip dates and dates of birth.  This is the precise sort of non-traditional public information that is used by banks and other consumer companies to verify identities, meaning the loss of this information will make it much more likely that Marriott customers will be subject to identity fraud, costing them thousands of dollars in remediation efforts and countless hours of their personal time.

20.    There is little doubt victims of the data breach will suffer significant and persistent financial harm as a result.  As reported in USA Today, "'The potential damage cannot be understated,' Paige Boshell, a privacy and cybersecurity attorney with Privacy Counsel in

010791-11 1090410 V1

Birmingham, Alabama, said to USA TODAY. 'This type of information may be retained and used over and over again for years.'" [8]

21.    In addition to selling Marriott consumer data to other fraudsters on the black market, the thieves could use the data to set up fraudulent financial accounts in victims' names, such as credit card accounts.

**2.    Marriott collects consumers' personal information.**

22.    Marriott is acutely aware that the consumer and business information it stores is highly sensitive and highly valuable to identity thieves and other criminals. On its website, Marriott lists the "personal data" it collects as follows:

- Name
- Gender
- Postal address
- Telephone number
- Email address
- Credit and debit card number or other payment data
- Financial information in limited circumstances
- Language preference
- Date and place of birth
- Nationality, passport, visa or other government-issued identification data
- Important dates, such as birthdays, anniversaries and special occasions
- Membership or loyalty program data (including co-branded payment cards, travel partner program affiliations)
- Employer details
- Travel itinerary, tour group or activity data
- Prior guest stays or interactions, goods and services purchased, special service and amenity requests
- Geolocation information

---

[8] *See* Reed, Anika, *Marriott Data Breach: Class-Action Suit Filed; Experts Ask Why It Wasn't Caught Earlier*, USA TODAY (Dec. 3, 2018), https://www.usatoday.com/story/travel/news/2018/12/03/marriott-data-breach-lawsuit-filed-2015-breach-prompts-questions/2190708002/ (last accessed Dec. 5, 2018).

- Social media account ID, profile photo and other data publicly available, or data made available by linking your social media and loyalty accounts[9]

23.    Marriott also states, "In more limited circumstances, we also may collect:

- Data about family members and companions, such as names and ages of children
- Biometric data, such as digital images
- Images and video and audio data via: (a) security cameras located in public areas, such as hallways and lobbies, in our properties; and (b) body-worn cameras carried by our loss prevention officers and other security personnel
- Guest preferences and personalized data ("Personal Preferences"), such as your interests, activities, hobbies, food and beverage choices, services and amenities of which you advise us or which we learn about during your visit[10]

24.    On this same web page, Marriott makes it clear that customers do not have the option not to provide it with their personal information.  It states:

> We use Personal Data and Other Data to provide you with Services, to develop new offerings and to protect the Marriott Group and our guests as detailed below. In some instances, we will request that you provide Personal Data or Other Data to us directly. *If you do not provide the data that we request, or prohibit us from collecting such data, we may not be able to provide the requested Services.*[11]

25.    There is little question that the above policy demonstrates Marriott was well aware of the need for it to protect consumers' highly valuable personal and financial information. But with its policies, under the heading "security", Marriott merely states:

> We seek to use reasonable organizational, technical and administrative measures to protect Personal Data. Unfortunately, no data transmission or storage system can be guaranteed to be 100% secure. If you have reason to believe that your interaction with us is no longer secure (for example, if you feel that the security of your account has been compromised), please immediately notify us in accordance with the "Contacting Us" section, below.[12]

---

[9] *See* https://www.marriott.com/about/privacy.mi (the list is found by expanding the "accessing personal data" tab) (last accessed on Dec. 5, 2018).

[10] *See id.*

[11] *See id.* (visible by expanding "use of personal data and other data") (last accessed Dec. 5, 2018) (emphasis added).

[12] *See id.* (visible by expanding "security") (last accessed Dec. 5, 2018).

- 9 -

26.     Marriott brazenly puts the impetus on its customers to themselves detect if their information is being stolen and then report it to Marriott.  But this is the exact opposite of what should be under this heading.  Marriott should be assuring customers that it is sufficiently protecting the plethora of their personal information that it is warehousing, but it cannot, because plainly it does not.  Its systems and security were so lax that it not only got hacked, but it had no inkling of the intrusion for four long years while its customers' information has been at the mercy of countless criminals and identity thieves.

27.     In addition to actually securing its data from hackers, by installing sufficient security and detection measures, another rudimentary step Marriott could have and should have taken is encryption.  While Marriott says it encrypted payment card data (though it also admits the keys to decrypt it may have also been stolen), Marriott should also have converted consumers' sensitive information into coded strings that would not be immediately useful, or even identifiable to cyber-thieves.  Yet Marriott apparently did not even take that step—which is ironic since the hackers apparently encrypted the personal data themselves so that they could exfiltrate it from Marriott's systems without Marriott knowing what it was.  Marriott should never have stored consumers' most sensitive information, including passport numbers, birth dates, and other personal information in plain text, readily identifiable and usable by anyone.

    **3.**    **Plaintiff and other Nationwide Class members have suffered harm as a result of the data breach.**

28.     As a result of Defendants' unfair, inadequate, and unreasonable data security, cyber-criminals now possess the personal and financial information of Plaintiff and the Class.  Unlike credit card data breaches, like those recently at Target Corp. and Home Depot, the harm here cannot be attenuated by cancelling and reissuing credit cards.  With passport numbers, names, addresses, birthdates, and credit information, criminals can open entirely new credit accounts and bank accounts, and garner millions through fraud that victims will not be able to detect until it is too late.  Victims' credit profiles can be destroyed and they will lose the ability to legitimately borrow money, obtain credit, or even open bank accounts.

29.     Further, criminals can file false federal and state tax returns in victim's names, preventing or at least delaying victims' receipt of their legitimate tax refunds and potentially making victims targets of IRS and state tax investigations.  At the very least, victims must add themselves to credit fraud watch lists, which substantially impair victims' ability to obtain additional credit.  Many experts advise a flat out freeze on all credit accounts, making it impossible to rent a car, get student loans, or buy or rent furniture or a new TV, let alone complete a major purchase such as a new car or home, without taking the time to request that the freeze be suspended, waiting the days it can take for that to occur, and then reinstating the freeze.  Further, there are four major reporting agencies, so consumers may need to take these steps with all of them because they will not know which bureau a creditor may consult.  Also, in many states, and in many circumstances, such freezes cost the consumer money.  Defendants are offering no relief for the monetary cost to go through this process at the four major credit reporting agencies, let alone for the value of time that will be spent doing all of this.

30.     Immediate notice of a data breach is essential to obtain the best protection afforded by identity theft protection services.  Marriott failed to provide such immediate notice, thus further exacerbating the damages sustained by Plaintiff and the Nationwide Class resulting from the breach. Marriott knew its systems were compromised at least as early as September 8, 2018, yet it made no disclosures until November 30, 2018.  Such delays are unwarranted, and directly increase the likelihood that thieves will be able to steal victims' identities before victims even know that they are at risk.

31.     When Marriott finally did act, it set up a separately hosted website to provide customers information and sent emails from easily spoofed accounts, failing to register for itself domains that cyber-thieves could use to further defraud Marriott customers.  As noted by Zach Whittaker at TechCrunch: "Marriott's breach response is so bad, security experts are filing in the gaps – at their own expense."[13]

---

[13] *See* Whittaker, Zack, *Marriott's Breach Response Is So Bad, Security Experts Are Filling In The Gaps—At Their Own Expense*, TECHCRUNCH (2018),

32.     Personal and financial information is a valuable commodity.  A "cyber black-market" exists in which criminals openly post stolen credit card numbers, passport numbers, and other personal information on a number of Internet websites. A credit card number trades for under $10 on the black market.  Magnetic track data increases the price, and a card with full personal information such as an address, phone number, and email address ("fullz") are traded at around $25 per record.[14]

33.     But this breach is far more valuable.  The data breach consists of over 500 million records that include at least name, address, birthdate, passport numbers, employment information, and even recent travel dates.  Complete identity records like those at issue here can sell for up to $200 on the black market, making this a breach potentially worth in excess of $100 billion to cybercriminals.[15]

34.     The personal and financial information that Defendants failed to adequately protect, including Plaintiff's identifying information, are "as good as gold" to identity thieves because identity thieves can use victims' personal data to open new financial accounts and incur charges in another person's name, take out loans in another person's name, incur charges on existing accounts, and file false federal and state tax returns.

35.     Although Marriott is offering free credit monitoring to some customers, the credit monitoring services do little to prevent wholesale identity theft.  Moreover, experts warn that batches of stolen information will not be immediately dumped on the black market.  "[O]ne year of credit monitoring may not be enough.  Hackers tend to lay low when data breaches are exposed. . .They often wait until consumers are less likely to be on the lookout for fraudulent

---

https://techcrunch.com/2018/12/03/marriott-data-breach-response-risk-phishing (last accessed Dec. 6, 2018).

[14] Max Cherney, *It's Surprisingly Cheap to Buy Stolen Bank Details*, MOTHERBOARD (Dec. 23, 2013), *available at*: https://motherboard.vice.com/en_us/article/nzewpx/its-surprisingly-cheap-to-buy-stolen-bank-details (last accessed Sept. 21, 2017).

[15] *See* http://www.secureworks.com/assets/pdf-store/white-papers/wp-underground-hacking-report.pdf (last accessed Dec. 20, 2018).

activities."[16]  In light of the seriousness of this breach and the nature of the data involved, one year of credit monitoring is decidedly not enough.

36.    This is especially true given the hackers' theft of passport numbers, which unlike credit cards, are not reissued.  A cybercriminal, especially one with millions of passport records, can hold on to stolen information for years until the news of the theft has subsided, then steal a victim's identity, credit, and bank accounts, resulting in thousands of dollars in losses and lost time and productivity.  Thus, Plaintiff and the Nationwide Class must take additional steps to protect their identities. And Plaintiff and the Nationwide Class must bear the burden and expense of identity and credit monitoring, and heightened vigilance for years to come.

## II.    JURISDICTION AND VENUE

37.    This Court has diversity jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).  Plaintiff and Defendant are citizens of different states.  The amount in controversy exceeds $5 million, exclusive of interest and costs, and there are more than 100 putative class members.

38.    This Court has personal jurisdiction over Defendants because Defendants regularly conduct business in Florida, where they own and operate over 60 hotel properties, including in the Southern District of Florida, and have minimum (and extensive) contacts with Florida and this District.

39.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Plaintiff is a resident of this district, Defendants regularly conduct business and reside in this district, a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims were committed in this district, and property that is the subject of the Plaintiff's claims are in this district.

---

[16] Andriotis, AnnaMaria, *Into The Breach: Identity-Theft Protection*, THE WALL STREET JOURNAL (Jan. 24, 2014), https://www.wsj.com/articles/into-the-breach-identitytheft-protection-1390607608 (last accessed Dec. 20, 2018).

- 13 -

### III.    PARTIES

**A.    Plaintiff**

**1.    Lisa Axelrod.**

40.    Plaintiff Lisa Axelrod is a Florida resident and was a Florida resident during the period when the data breach occurred.  Plaintiff is a Marriott Starwood member and made a reservation at a Marriott Starwood property during the period of the data breach.  Marriott's disclosures concerning the data breach indicate that Plaintiff's data was stolen.

41.    Plaintiff was harmed in having her personal and financial information compromised as a result of the data breach, including her credit card information.

42.    Plaintiff noticed suspicious activity on her credit report after the data breach.

43.    Plaintiff would have taken steps to protect her personal and financial information or would have sought hospitality services elsewhere had Defendants informed her that they lacked adequate computer network and data security to secure Plaintiff's and others' personal and financial information.

44.    Plaintiff suffered actual injury from having her financial and personal information compromised and stolen as a result of the data breach and was further injured by Defendants' failure to provide timely and accurate notice that her data had been breached.

45.    Plaintiff suffered actual injury and damages as a result of the data breach that she would not have otherwise suffered: (1) had Defendants disclosed that they lacked the computer network and data security to adequately protect Plaintiff's personal and financial information, or (2) had Defendants provided timely and accurate notice that Plaintiff's data had been breached.

**B.    The Defendants**

46.    Defendant Marriott is a Delaware corporation with its principal place of business in Bethesda, Maryland.

47.    Defendant Starwood is a Delaware Limited Liability Company with its principal place of business in Bethesda, Maryland.

- 14 -

# IV.    CLASS ALLEGATIONS

48.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action as a national class action on behalf of herself and all members of the following class of similarly situated individuals and entities:

**The Nationwide Class**[17]

All persons in the United States whose personal and financial information was compromised as a result of the data breach first disclosed by Defendants on or about November 30, 2018.

49.    Excluded from the Nationwide Class are Defendants, including any entity in which Defendants has a controlling interest, which is a parent or subsidiary, or which is controlled by the Defendants, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants.

50.    Plaintiff also seeks to certify the following Subclass of the Nationwide Class:

**The Florida Subclass**

All members of the Nationwide Class who are residents of Florida.

51.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

52.    All members of the proposed Nationwide Class and Florida Subclass are readily ascertainable.  Defendants have access to addresses and other contact information for all members of the Class, which can be used for providing notice to Nationwide Class and Florida Subclass  members.

53.    ***Numerosity***.  The Nationwide Class is so numerous that joinder of all members is unfeasible and not practical.  While the precise number of Nationwide Class members has not been determined at this time, Defendants have admitted that some 500 million records were

---

[17] Throughout this Complaint, Plaintiff uses the terms "Nationwide Class" and "Class" interchangeably to refer to the nationwide class defined in this paragraph.

010791-11 1090410 V1

breached.  Given this enormous number, the Florida Subclass will also be sufficiently numerous to merit class certification

54.    ***Commonality***.  Questions of law and fact common to all Nationwide Class and Florida Subclass members exist and predominate over any questions affecting only individual Nationwide Class members, including, *inter alia*:

a.    whether Defendants engaged in the wrongful conduct alleged herein;

b.    whether Defendants' conduct was deceptive, unfair, and/or unlawful;

c.    whether Defendants owed a duty to Plaintiff and members of the Nationwide Class to adequately protect their personal and financial information;

d.    whether Defendants owed a duty to provide timely and accurate notice of the data breach to Plaintiff and members of the Class;

e.    whether Defendants used reasonable and industry-standard measures to protect Nationwide Class members' personal and financial information;

f.    whether Defendants knew or should have known that its data system was vulnerable to attack;

g.    whether Defendants' conduct, including its failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the loss of tens of millions of Nationwide Class members' personal and financial data;

h.    whether Defendants should have notified the public immediately after it learned of the data breach;

i.    whether Defendants violated state statutory consumer protection, consumer fraud, data-breach-notification, and other applicable laws;

j.    whether Defendants violated state common law as to negligence;

k.    whether Plaintiff and Nationwide Class members are entitled to recover actual damages, statutory damages, and/or punitive damages; and

l.    whether Plaintiff and Nationwide Class members are entitled to restitution, disgorgement, and/or other equitable relief.

55.    ***Typicality***.  Plaintiff's claims are typical of the claims of the Class. Plaintiff and all Nationwide Class members were injured through the uniform misconduct described above and assert the same claims for relief.

- 16 -

56.    *Adequacy*.  Plaintiff and her counsel will fairly and adequately represent the interests of the Nationwide Class members.  Plaintiff has no interests antagonistic to, or in conflict with, the interests of the Nationwide Class members.  Plaintiff's lawyers are highly experienced in the prosecution of consumer class actions and complex commercial litigation.

57.    *Superiority*.  A class action is superior to all other available methods for fairly and efficiently adjudicating the claims of Plaintiff and the Nationwide Class members.  Plaintiff and the Nationwide Class members have been harmed by Defendants' wrongful actions and/or inaction.  Litigating this case as a class action will reduce the possibility of repetitious litigation relating to Defendants' wrongful actions and/or inaction.

58.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3), because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

59.    Class certification also is appropriate under Fed. R. Civ. P. 23(b)(2), because Defendants have acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Nationwide Class as a whole.

60.    The expense and burden of litigation would substantially impair the ability of Plaintiff and Nationwide Class members to pursue individual lawsuits to vindicate their rights.  Absent a class action, Defendants will retain the benefits of its wrongdoing despite its serious violations of the law.

## V.    COUNTS

## COUNT I

### NEGLIGENCE
### (BROUGHT BY PLAINTIFF ON HER OWN BEHALF AND
### ON BEHALF OF THE NATIONWIDE CLASS, OR, ALTERNATIVELY,
### PLAINTIFF ON HER OWN BEHALF AND ON BEHALF OF
### THE FLORIDA SUBCLASS)

61.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

62.    Plaintiff brings this count on her own behalf and on behalf of the Nationwide Class under the laws of the state of Maryland, or, alternatively, on her own behalf and on behalf of the Florida Subclass under the negligence laws of Florida.

63.    By accepting and storing Plaintiff's and the Nationwide Class and Florida Subclass members' non-public personal and financial information, including highly sensitive information such as names, dates of birth, email addresses, telephone numbers, credit card numbers, and passport numbers, Defendants assumed a duty, including a special or fiduciary duty, to Plaintiff and  the Nationwide Class and Florida Subclass members requiring it to use reasonable and, at the very least, industry-standard care to secure such information against theft and misuse.

64.    Defendants breached their duty of care by failing to adequately secure and protect Plaintiff's and the Nationwide Class and Florida Subclass members' personal and financial information from theft, access, collection, and misuse by third parties.

65.    Further, Defendants breached their duty of care by failing to act to protect Plaintiff's and the Nationwide Class and Florida Subclass members' personal and financial information, including, upon information and belief, by neglecting to promptly, completely, and effectively patch and repair its systems when initially advised of one or more critical flaws or vulnerabilities in the system and/or software, such that the referenced data breach has occurred.

66.    Defendants further breached their duty of care by failing to promptly, timely, clearly, accurately, and completely inform Plaintiff and the Nationwide Class that their personal and financial information had been stolen.

67.    Plaintiff and members of the Nationwide Class and Florida Subclass have suffered injury in fact, including monetary damages, and will continue to be injured and incur damages as a result of Defendants' negligence and misconduct.

68.    As a direct and proximate result of Defendants' failure to take reasonable care and use at least industry-standard measures to protect the personal information placed in its care, Plaintiff and members of the Nationwide Class and Florida Subclass had their personal and financial information stolen, causing direct and measurable monetary losses, threat of future losses, identity theft, and threat of identity theft.

69.    As a direct and proximate result of Defendants' negligence and misconduct, Plaintiff and members of the Nationwide Class and Florida Subclass were injured in fact by: identity theft; the loss of the monetary value, including the market value, of their personal and financial information, or PII, due to the data breach, which has led to, or will lead to, its sale on the black market or its presence on dark web sites; damage to credit scores and credit reports; and time and expense related to: (a) finding fraudulent accounts; (b) monitoring their identity; (c) credit monitoring and identity theft prevention; (d) freezing access to their credit reports at major credit bureaus; (e) income tax refund fraud and the potential for income tax refund fraud; (f) the general nuisance and annoyance of dealing with all these issues resulting from the data breach; and (g) costs associated with the loss of productivity from taking time to ameliorate the actual and future consequences of the data breach, all of which have an ascertainable monetary value to be proven at trial.

- 19 -

## COUNT II

### NEGLIGENCE *PER SE*
### (BROUGHT BY PLAINTIFF ON HER OWN BEHALF AND ON BEHALF OF
### THE NATIONWIDE CLASS, OR, ALTERNATIVELY, PLAINTIFF ON HER
### OWN BEHALF AND ON BEHALF OF THE FLORIDA SUBCLASS)

70.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

71.     Plaintiff brings this count on her own behalf and on behalf of the Nationwide Class under the laws of the state of Maryland, or, alternatively, on her own behalf and on behalf of the Florida Subclass under the negligence laws of Florida.

72.     Pursuant to Section 5 of the Federal Trade Commission Act ("FTC Act"), and pursuant to the Florida state laws referred to and referenced below ("State Laws"), Defendants had a duty to keep and protect the personal information of all Plaintiffs and Nationwide Class members.

73.     Defendants violated the FTC Act and the State Laws by failing to keep and protect Plaintiff's and Nationwide Class members' extremely sensitive and valuable personal and financial information, failing to monitor, and/or failing to ensure that it complied with data security standards, industry standards, statutes, and/or other regulations to protect such personal and financial information.  All such omissions were patently unreasonable given the high stakes if malicious actors were to access such information, which they now have done.

74.     Defendants' failure to comply with the FTC Act, State Laws, and/or other industry standards and regulations, constitutes negligence *per se*.

75.     Defendants violated the FTC Act and the State Laws by failing to safe-keep and protect Plaintiff's and Nationwide Class members' personal and financial information, failing to monitor, and/or failing to ensure that Defendants complied with applicable and current data security standards, statutes, and/or other regulations to protect such personal and financial information.

76.     Further, Defendants violated the FTC Act and the State Laws by failing to act to protect Nationwide Class members' personal and financial information, including, upon information and belief, by neglecting to promptly patch and repair its systems when advised of one or more critical flaws or vulnerabilities in the system and/or software, such that the referenced data breach has occurred.

77.     Defendants' failure to comply with the FTC Act, the State Laws, and/or other industry standards and regulations constitutes negligence *per se*.

78.     Plaintiff and members of the Nationwide Class and Florida Subclass have suffered injury in fact, including monetary damages, and will continue to be injured and incur damages as a result of Defendants' negligence *per se*.

79.     As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and members of the Nationwide Class and Florida Subclass had their personal and financial information stolen, causing direct and measurable monetary losses, threat of future losses, identity theft, and threat of identity theft.

80.     As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and members of the Nationwide Class and Florida Subclass were injured in fact by: identity theft; the loss of the monetary value, including the market value, of their personal and financial information, or PII, due to the data breach, which has led to, or will lead to, its sale on the black market or its presence on dark web sites; damage to credit scores and credit reports; and time and expense related to: (a) finding fraudulent accounts; (b) monitoring their identity; (c) credit monitoring and identity theft prevention; (d) freezing access to their credit reports at major credit bureaus; (e) income tax refund fraud and the potential for income tax refund fraud; (f) the general nuisance and annoyance of dealing with all these issues resulting from the data breach; and (g) costs associated with the loss of productivity from taking time to ameliorate the actual and future consequences of the data breach, all of which have an ascertainable monetary value to be proven at trial.

## COUNT III

### MARYLAND CONSUMER PROTECTION ACT
### MD CODE COMMERCIAL LAW, § 13-301, *ET. SEQ.*
### (BROUGHT BY PLAINTIFF ON HER OWN BEHALF AND ON BEHALF OF
### THE NATIONWIDE CLASS, OR, ALTERNATIVELY, PLAINTIFF ON HER
### OWN BEHALF AND ON BEHALF OF THE FLORIDA SUBCLASS)

81.     Plaintiff incorporates the above allegations by reference.

82.     Plaintiff brings this count on her own behalf and on behalf of the Nationwide

Class.

83.     Nationwide Class members are "consumers" as meant by Md. Code Ann., Com.

Law § 13-101.

84.     The unlawful trade practices, misrepresentations, and omissions described herein

did not constitute "professional services" on the part of Defendants.

85.     Defendants engaged in unlawful trade practices, misrepresentations, and the

concealment, suppression, and omission of material facts with respect to the sale and

advertisement of the services in violation of Md. Code Ann., Com. Law § 13-301, in at least the

following ways:

a.     Defendants misrepresented material facts to Plaintiff and Nationwide

Class members by representing that they would maintain adequate data privacy and security

practices and procedures to safeguard Nationwide Class members' personal and financial

information from unauthorized disclosure, release, data breaches, and theft in violation of Md.

Code Ann., Com. Law § 13-301(1), (2)(i), (2)(iv), (3), (5)(i), (9)(i), (9)(iii), and 14(xxi);

b.     Defendants misrepresented material facts to the Nationwide Class

members by representing that they did and would comply with the requirements of relevant

federal and state laws pertaining to the privacy and security of Nationwide Class members'

personal and financial information in violation of Md. Code Ann., Com. Law § 13-301(1), (2)(i),

(2)(iv), (3), (5)(i), (9)(i), (9)(iii), and 14(xxi);

- 22 -

c.      Defendants omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Nationwide Class members' personal and financial information in violation of Md. Code Ann., Com. Law § 13-301(1), (2)(i), (2)(iv), (3), (5)(i), (9)(i), (9)(iii), and 14(xxi);

d.      Defendants engaged in unfair acts and practices by failing to maintain the privacy and security of Nationwide Class members' personal and financial information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the data breach. These unfair acts and practices violated duties imposed by laws including the FTC Act (15 U.S.C. § 45); the Gramm-Leach-Bliley Act (15 U.S.C. § 6801) and its Safeguards Rule; Maryland's Privacy of Consumer Financial and Health Information regulations (Md. Code Regs. 31.16.08.01, et seq.); and Maryland's data breach statute (Md. Code Ann., Com. Law § 14-3503);

e.      Defendants engaged in unfair acts and practices by failing to disclose the data breach to Nationwide Class members in a timely and accurate manner, in violation of Md. Code Ann., Com. Law § 14-3504(b)(3);

f.      Defendants engaged in unfair acts and practices by failing to take proper action following the data breach to enact adequate privacy and security measures and protect Nationwide Class members' personal and financial information from further unauthorized disclosure, release, data breaches, and theft.

86.     The above unfair and deceptive practices and acts by Defendants was immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

87.     Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Nationwide Class members' personal and financial information and that risk of a data breach or theft was highly likely. Defendants'

- 23 -

actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Nationwide Class.

88.    As a direct and proximate result of Defendants' unlawful practices, Nationwide Class members suffered injury and/or damages.

89.    Nationwide Class members seek relief under Md. Code Ann., Com. Law § 13-408, including, but not limited to, damages, injunctive relief, and attorneys' fees and costs.

**COUNT IV**

**UNJUST ENRICHMENT**
**(BROUGHT BY PLAINTIFF ON HER OWN BEHALF AND ON BEHALF OF THE NATIONWIDE CLASS, OR, ALTERNATIVELY, PLAINTIFF ON HER OWN BEHALF AND ON BEHALF OF THE FLORIDA SUBCLASS)**

90.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

91.    Because no adequate legal remedy is available under any applicable contract, Plaintiff brings this count in quasi contract on behalf of herself and her fellow putative class members in order to pursue restitution based on Defendants' unjust enrichment including by way of their retention of profits that should have been expended to protect the data of the putative class, per its published privacy agreements and policies.  *See, e.g.*, Restatement (Third) of Restitution and Unjust Enrichment § 39(1) (2011) (supporting claims under the opportunistic breach theory of restitution, which provides a claim for relief when a deliberate breach of contract results in profit to the defaulting promisor and the available damage remedy affords inadequate protection to the promisee's contractual entitlement, measured by the profit realized by the defaulting promisor).

92.    As alleged herein, Defendants have unjustly received and retained monetary benefits from Plaintiff and the Nationwide Class, such that inequity has resulted.

- 24 -

93. By engaging in the conduct described in this complaint, Defendants knowingly obtained benefits from Plaintiff and the Nationwide Class as alleged herein under circumstances such that it would be inequitable and unjust for Defendants to retain them.

94.    By engaging in the acts and failures to act described in this complaint, Defendants have been knowingly enriched by the savings in costs that should have been reasonably expended to protect the data of Plaintiff and the Nationwide Class.  Defendants were on notice that gathering and transmittal of their customers' data could happen yet they failed to take reasonable steps to pay for the level of security required to have prevented such unauthorized access, gathering, and transmittal to third parties.

95.    By engaging in the conduct described in this complaint, Defendants have knowingly obtained benefits from Plaintiff and the Nationwide Class under circumstances such that it would be inequitable and unjust for it to retain them. It is believed and therefore alleged that Defendants have collected either goods or services and otherwise used the data belonging to Plaintiff and the Nationwide Class for its benefit and to the detriment of plaintiff and the Nationwide Class.

96.    Thus, Defendants will be unjustly enriched if they are permitted to retain the benefits derived from the unauthorized and impermissible gathering and sharing of Plaintiff and the Nationwide Class's data.

97.    Plaintiff and each member of the Nationwide Class are therefore entitled to a restitutionary award in an amount to be determined at trial, or the imposition of a constructive trust upon the monies derived by the Defendants by means of the above-described actions, whether the sums of monies are those that it should have devoted to complying with its agreements and policies as they pertain to the customer data that is the subject of this lawsuit or other sums as it may be just and equitable to return to them.

010791-11 1090410 V1

**COUNT V**

**VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE
PRACTICES ACT, FLA. STAT. § 501.201, ET SEQ., AND THE
UNFAIR TRADE PRACTICES STATUTES
(BROUGHT BY PLAINTIFF AND THE FLORIDA SUBCLASS)**

98.     Plaintiff Lisa Axelrod is a resident of Florida and was also a resident of Florida when the data breach occurred.  Plaintiff brings this Count on her own behalf and on behalf of members of the Florida Subclass.

99.     At all relevant times, Defendants provided goods and/or services and thereby was engaged in trade or commerce.

100.     At all relevant times, Plaintiff and the Florida Subclass members were consumers.

101.     Defendants was aware that consumers provided and it collected confidential and non-public information and personally identifiable material in connection with Defendants' business in Florida.

102.     Plaintiff and the Florida Subclass expected, and Defendants assured, that personal and financial information and non-public information maintained by Defendants would be protected and that it would not be disclosed to third parties.

103.     Defendants participated in misleading, false, or deceptive acts that violated Florida state law.  By claiming to adequately secure consumers' personal and financial information, when in truth and fact its security practices were inadequate, Defendants engaged in deceptive business practices prohibited by the laws of Florida.

104.     In the course of its business, Defendants stored and warehoused the personal and financial information of hundreds of thousands, if not millions, of consumers in Florida, yet it did not take adequate steps to protect such data from theft, and otherwise engaged in activities with a tendency or capacity to deceive.  Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment,

suppression, or omission, in connection with its provision of services to citizens and businesses in Florida.

105.    Defendants have known of its inadequate data security, but it concealed all of that information until recently.

106.    In the course of Defendants' business, it willfully failed to disclose and actively concealed that it was not taking industry-standard and reasonable steps to protect the personal and financial information of some 500 million consumers.  Defendants compounded the deception by failing to disclose multiple data breaches.

107.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and members of the Florida Subclass, about the true security of its data systems, the ability of Defendants to provide data security, and the integrity of the Defendants companies.

108.    Defendants intentionally and knowingly misrepresented material facts regarding its services and its ability to protect consumers' personal and financial information with an intent to mislead Plaintiff and the Florida Subclass.

109.    Additionally, by way of these unfair, unlawful, and deceptive acts and practices, Defendants violated duties imposed by laws including the FTC Act (15 U.S.C. § 45), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801) and its Safeguards Rule; and Florida law.

110.    Defendants knew or should have known that their conduct violated the state statutes set forth below.

111.    Defendants made material statements about the security and reliability of its computer and data systems and Defendants' services that were either false or misleading.

112.    Defendants owed Plaintiff a duty to disclose the true nature and extent of its computer and data system security and that it had suffered data breaches, because Defendants:

        a.    Possessed exclusive knowledge that it valued profits over the bona fide protection of consumers' personal and financial information and that it had suffered multiple data breaches;

- 27 -

b.      Intentionally concealed the foregoing from Plaintiff; and/or

c.      Made incomplete representations about the security of its computer and data systems, while purposefully withholding material facts from Plaintiff that contradicted these representations.

113.    Because Defendants fraudulently concealed its deficient computer and data security and its data breaches, resulting in the theft of personal and financial information of up to 500 million consumers, Plaintiff and the Florida Subclass listed below have been harmed.

114.    Defendants' deficient computer and data security and its concealment of its data breaches were material to Plaintiff and the Florida Subclass.  Plaintiff and members of the Florida Subclass would have taken steps to protect their personal and financial information had they known that it was at risk, and in fact had been stolen from Defendants' computer and data systems.

115.    Plaintiff and the Florida Subclass suffered ascertainable loss caused by Defendants' misrepresentations and its concealment of and failure to disclose material information.  Florida Class members have spent hours attempting to protect themselves from identity theft and have spent money to initiate credit freezes and taken other reasonable steps to limit their exposure to identity and credit theft.

116.    Defendants had an ongoing duty to all persons about whom it maintained personal information to refrain from unfair and deceptive acts or practices under Florida law.  All persons whose data was stolen in the data breach suffered ascertainable loss in the form of their loss of time, out-of-pocket expenses for credit freezes and identity-theft protection, and/or continuing and heightened risk of identity theft.  Additionally, Plaintiff, Nationwide Class members, and Florida Subclass members have lost the monetary value, including the market value, of their personal and financial information, or PII, due to the data breach which has led to, or will lead to, its sale on the black market or its presence on dark web sites.

117.    Defendants engaged in unfair or deceptive acts and practices by knowingly permitting the personal and financial information to be exposed through a network that was

unsecure or had inadequate safeguards, resulting in the dissemination of private personal and financial information of customers in direct violation of the Unfair Trade Practices Statutes.

118.    Defendants engaged in unfair or deceptive acts and practices by failing to timely notify Plaintiff and the Florida Subclass of the security breach and compromise.

119.    Defendants' practice and course of conduct, as alleged herein, is likely to mislead—and has misled—the consumer acting reasonably in the circumstances, to the consumer's detriment.

120.    Further, Defendants have engaged in an unfair practice that offends established public policy, and is one that is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to customers.

121.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Florida Subclass members suffered actual damages and request a corresponding award of damages against Defendants, as authorized by such statutes.

122.    In the alternative, Plaintiff and the Florida Subclass members have suffered irreparable harm for which there is no adequate remedy at law as a result of Defendants' conduct, and Plaintiff and the Florida Subclass members are entitled to appropriate temporary and permanent injunctive relief, as authorized and provided by such statutes. Plaintiff and the Florida Subclass members are further entitled to preliminary or other relief as provided by such statutes, including statutory damages, punitive damages, costs, and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request the following relief:

A.    That the Court certify this case as a class action and appoint the named Plaintiff to be Nationwide Class and/or Florida Subclass representative and her counsel to be Class Counsel;

B.    That the Court award Plaintiff and the Nationwide Class and/or Florida Subclass appropriate relief, to include actual and statutory damages, disgorgement, and restitution, and punitive, exemplary, or multiple damages where available;

C.      That the Court award Plaintiff and the Nationwide Class and/or Florida Subclass preliminary or other equitable or declaratory relief as may be appropriate by way of applicable state or federal law;

D.      Such additional orders or judgments as may be necessary to prevent these practices and to restore to any person in interest any money or property which may have been acquired by means of the violations; and

E.      That the Court award Plaintiff and the Nationwide Class and/or Florida Subclass such other, favorable relief as may be available and appropriate under law or at equity.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all issues so triable.

010791-11 1090410 V1

DATED:  January 15, 2019                 Respectfully submitted,

**KOZYAK TROPIN & THROCKMORTON LLP**

By: _/s/ Detra Shaw-Wilder_

    Detra Shaw-Wilder, Florida Bar No. 037184
2525 Ponce de Leon Boulevard, 9th Floor
Miami, Florida  33134
Telephone: (305) 372-1800
Facsimile: (305) 372-3508
dps@kttlaw.com

_Attorneys for Plaintiff and the Proposed Classes_

Thomas E. Loeser (_pro hac vice_ to be filed)
Shelby R. Smith (_pro hac vice_ to be filed)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
toml@hbsslaw.com
shelby@hbsslaw.com

_Attorneys for Plaintiff and the Proposed Classes_

010791-11  1090410 V1